The next case is Otsuka Pharmaceutical v. Lupin, Case No. 24-2297. Mr. Garrett, when you're ready. Good morning, Your Honors. May it please the Court, I'd like to begin with infringement. This case turns on a straightforward legal error. The Court rejected Lupin's claim interpretation, yet it relied on expert testimony predicated on that very interpretation to decide infringement. In doing so, the Court tied completion of the claim reaction to the arbitrary timing of Lupin's quench manufacturing step, rather than on the science itself. Under the district court's approach, infringement can be avoided simply by postponing the quench manufacturing step until after one equivalent has been added, even if the science demonstrates that the reaction had reached completion long before that point in time. At trial, Lupin interpreted the claims to mean that the reaction continues so long as even a single molecule of ketone or sodium borohydride remained. Under that view, the reaction will continue even after the ketone content has fallen to 0.00. And the district court rejected that as a matter of claim construction. That said, it didn't have to be absolute completion. It had to be, I don't know if they used the word practical, if he used the word practical completion, but it seems like that's the basic concept here. But then he concluded as, I'm not sure why I understand this is a legal error. He concluded as a matter of fact that their reaction hadn't completed before 1.0 was put in. Is that what? It's a legal error. I mean, it might be that it's clear error on infringement, but I don't understand what the legal error is. It's legal error because the court misapplied the claim construction. The court stated that it was rejecting Lupin's construction, but then it went on to rely on expert testimony predicated on that very interpretation. So you're saying, like, that he had the correct claim construction and his factual conclusion about infringement was wrong because it relied on testimony that went to an improper period of time? I'm not sure you should get hung up in this legal versus factual error because it's not a battle that you necessarily need to win. I understood, Your Honor, and I appreciate that. I just don't understand. You're not arguing claim construction error. We're arguing misapplication of the claim construction. The case law — I'm not sure how that is a legal question. The case law is clear that misapplications of claim constructions are reviewed just as regular claim construction decisions are reviewed. Here, when the reaction reaches completion, was the only infringement issue in the case. Right. That's a factual issue. Well, it's not. I think I really — I gave you advice once. I think you should take it and stop fighting this and explain to me why, as a matter of fact, what he found is incorrect under the claim construction he gave. Thank you, Your Honor. The district court's finding is incorrect under either standard because the evidence demonstrates that the claim reaction is complete before one molar of sodium borohydride has been added. And what's that evidence? Well, the evidence is multifold, Your Honor. OSUPA presented data in Experiments 109 and 115. Give us specific J.A. pages for support for what you think is the best evidence in response to Judge Hughes's question. Yes, Your Honor. The evidence demonstrates that the DMF discloses the reaction conditions. The DMF reaction conditions are disclosed at APPX 308, APPX 312, APPX 427. The evidence also reflects the known sodium borohydride reaction rates. Dr. Dicktel, or Dr. Rausch, was offered and admitted as an expert in sodium borohydride reaction rates without objection over lupin. He testified that these reactions proceed very quickly. He explained that, based on his experience as well as evidence in the record, once lupin has added 0.25 molar equivalents of sodium borohydride, the reaction will be complete within 30 minutes. That testimony was uncontroverted. Dr. Dicktel offered no testimony with respect to when the reaction achieves practical completion. Is that the testimony that Judge Andrews rejected because the expert didn't actually do any experiments and it was just his opinion and it was conclusory? Your Honor, Otsuka did not perform any testing because Otsuka had the evidence to demonstrate infringement even without it. Lupin performed testing during the development of its DMF. That's Experiments 109 and 115. The district court dismissed those experiments and then disregarded Dr. Rausch's other testimony. But even putting aside Experiments 109 and 115, Otsuka has met its burden in this case. We have Dr. Rausch's testimony. It's not conclusory. It's based on the DMF reaction conditions. It's based on the known sodium borohydride reaction rates. I take it your view is that he didn't actually have to perform experiments because he's an expert in this field and based on his experience, he can testify this is what would have happened. Yes, Your Honor. And that testimony is grounded in the DMF conditions. It's grounded in sodium borohydride reaction rates and his expertise. And notably, that testimony went uncontroverted. Again, Dr. Dichtel did not dispute that these reactions proceed very quickly. He did not dispute that by the time you've added .25 molar equivalents, that's what you need for the reaction to go to completion due to the stoichiometry. Once you've added that minimum amount, it'll be complete within 30 minutes. Dr. Dichtel did not offer any testimony to dispute that conclusion. So Zuka has met its burden even once we set aside experiments 109 and 115. Dr. Dichtel's testimony, he offered no testimony about when the reaction actually reaches practical completion. He was focused on when the reaction reaches absolute completion. And that's exactly what the district court disregarded. If you, if I can give an example. At APPX 526 and 527, Dr. Dichtel makes clear his belief that the parties were fighting over exactly when the reaction is going to be absolutely stopped. He thought the parties were fighting over when the reaction absolutely stops. But that's precisely what the district court rejected. Dr. Dichtel offered no testimony with respect to when the reaction achieves practical completion. Dr. Rausch's testimony on that point went unrebutted. Can you look at that testimony specifically regarding this absolute stopping point? Because it seems to be one of your key points. What's the correct pages to look at? The testimony I just referenced, Your Honor, was at APPX 526 and 527. Now, let's move along to the next step. Your Honor, do you have any questions on this testimony, or would you like me to walk us through it? I would like you to start walking us through it, and then I will pose questions as you're going. Understood. Thank you. I assume you're looking at around line 14 on 526, is that where you're starting? That's right. If we start at line 10 on 526, Dr. Dicktel, we were looking at a document where Lupin's DMF, which references a completion of reaction, and he was asked that Lupin's scientists are defining completion in reference to completion of reaction as being 0.05, that's ketone content. That's how Lupin's scientists are defining completion. They're defining it based on practical completion. And Dr. Dicktel said, I fully agree with that, that that is what it says, but when this was written, I'm not sure Lupin's scientists were anticipating in time that we were going to be fighting over exactly when they were, when the reaction was going to be absolutely stopped. So, again, Dr. Dicktel thought the parties were fighting over exactly when the reaction is absolutely stopped, not when it reaches practical completion. The idea that the reaction stops when it absolutely stops, that's precisely what the district court rejected in its post-trial claim construction in APPX 13 and 14. So your argument in part is just that you believe that Dr. Dicktel was applying the wrong construction? Is that your argument in sum? Yes, Your Honor. He was providing the wrong construction. He was providing the construction that the district court rejected in its post-trial decision. His testimony on completion went to absolute completion, not the point at which the reaction reaches practical completion. Only Dr. Rausch testified on that point. Dr. Rausch, again, admitted as an expert in sodium borohydride reactions without objection from a Lupin. He provided an explanation based on the evidence, based on the DMF itself, based on sodium borohydride reaction conditions, and he explained once you've added .25 molar equivalents, the reaction will be done within half an hour. That is long before Lupin has added one equivalent of sodium borohydride. Well, I mean, I see what you're saying, but he is also suggesting that there's basically a disconnect here. And what we're talking about is not when the reaction is practically complete, but when the reaction is sufficiently complete that they don't feel that they need to let it play out anymore because it's pure enough and they don't have to, whatever, spend more time doing it. So how do you explain that? Because that seems to me a different thing than requiring absolute completion for purposes of the claim construction. I mean, practical completion, and this is what seems to me that Judge Andrews may have gotten, may have agreed with, or I'm having a little confusion here myself, is you can put in whatever the stuff until it gets a certain level, and you can stop it whenever you want, right? It has to reach a certain purity level for all the other claims, but you just quench it whenever you want. How does that tie up with practical completion, which is what you're arguing? I think I understand, Your Honor. If you don't, don't worry about it. It seems to me he was testifying that the point in time that we're talking about could be after a year of practical completion because it's just when the company feels like it's okay to move on to the next step. And that may have been different than when the reaction had reached a certain practical completion state. It could be later. It could be earlier. And how do you – I don't quite understand his testimony. I understand how you're trying to portray it, but I read it, and it's not so clear to me that it says what you're saying it says. Well, so Dr. Dicktel, he believed that the reaction would continue so long as even a single molecule of ketone remained. Well, that's technically correct, but it's inconsistent with the practical completion claim construction. Well, it's not technically correct in the context of these claims. Again, completion is – has to be viewed in the context of the claims. And in the claims, APOSA would conclude the reaction is done by the time you reach practical completion. It's done. Are there trace amounts of ketone? Maybe. I guess, but would you – would APOSA actually look at this and say the reaction is complete when they decide it's complete enough to do the quenching step? And is that what that testimony means? Well, no, Your Honor, because the quenching step is an arbitrary manufacturing step. It's not tied to – That's what his testimony is all about. That's the problem. That's the way I read his testimony, is saying this – all of this – these product by process claims, the completion is when they decide it's complete and decide to put whatever in. Is it just water to stop it? And that that's the completion step. And that's purely not a chemistry step. It's a kind of money step or resources step. I mean, that's what he – it seems like he's alluding to that a couple times, too. He certainly uses the word absolute. But how do I – how do I figure out that and if that's correct? Your Honor, the testimony that Dr. Diktel gave, again, was that the reaction proceeds so long as there is even a single molecule. It would – the reaction would go on. But we don't need to argue about that. Because I think there's – even if you accept that that extreme is not what these claims contemplate, what he's also saying is, sure, the reaction is maybe substantially complete, but what these patents are talking about is when they feel comfortable moving on to the next step, which to me, I assume he's talking about it's good up that we're going to put in the quenching and move on to the next step. Why isn't that a proper reading of those claims? Because the quench step, again, is untethered to the actual progress of the reaction. The quench step is not based on the actual science of the reaction. It's not based on when the ketone content has fallen to a certain point. And your view is that the language and the claims rely on the chemical process, not the manufacturing process. Absolutely, Your Honor. If you look at the claims, it's all about the chemistry. The reaction here is synthesizing tovaptan by reducing the ketone in order to avoid an undesirable impurity. When the ketone has been reduced in a practical sense, you have avoided that impurity, regardless of whether you've yet quenched. You can wait ten more hours and then quench, but you've avoided the impurity long ago based on the science. And the claim has been practiced at that point in time.  I guess one question I have is, so there's only a literal infringement claim here, no DOE, right? That's correct, Your Honor. Okay. All right. Okay. Okay. We've asked a lot of questions, so I'll restore all five minutes of your rebuttal. Mr. Zimmerman, I'll give you 20 minutes if you need all of it since we gave him extra time. Don't feel like you have to take it, though. Twenty? No, give him 20. Give him 20. Thank you, Your Honor. Good morning. May it please the Court. I'd like to turn directly to Judge Andrews' findings on infringement, and they're found at pages 14 and 15 of the Joint Appendix. And the first thing he does is adopt the practical completion standpoint, which Otsuka argued for, and then he adopts Dr. Rausch's interpretation, if you will, of that construction. And that is the moment when an experimentalist decides the reaction is done and wants to work it out. And that's consistent with Dr. Rausch's testimony at A381 lines 4 through 9, that completion – it's complete when I've decided to proactively stop it, and Dr. Rausch said it again at page 370, lines 4 through 20. And it's complete when an experimentalist decides it's done and wants to work it out. So under Otsuka's construction, the judge looked at the reaction and said, when does Dr. Rausch decide to loop and work it up? It was undisputed that they work it up after they put in 1.2 molar equivalents of sodium borohydride and proceed to the quench step. And that's undisputed. So if that's the analysis, and we don't believe that's clearly erroneous, then the 1.2 molar equivalents is outside of the claim, and there's no infringement. But Judge – But in the chemical process, though, does it reach practical completion before we hit 1? So that was the next piece Judge Andrews addressed. And he said, okay, what is the number for practical completion? Lupin runs an in-process quality check, and the standard is when the ketone precursor level is .05 percent. And if they pass, then they go to the quench step. But the testimony, which was undisputed, Rausch, Otsuka's expert, at A380 lines 11 through 17, and A387 lines 3 through 9, admits that the reaction goes past that .05 percent standard. So that can't be the standard. And if you look at A2285, Lupin did three exhibit batches and ran the in-process quality check, and they all showed zero or none detected, meaning the reaction goes past this .05 percent level. And Judge Andrews said the .05 percent level is just an arbitrary standard where it's complete enough to move on. But then he went on to say that's the bottom of the five standard because of the claims. What was that? Isn't that because the claims are required to be 99.5 percent pure? Why they stop at the .05 percent? Or the .05 percent. Here's the problem I'm having with this, and your argument is it seems the claims talk about a certain purity level. That happens at a certain point in time, not when you decide to check it. Right? Yes. You didn't claim this as, you know, 99.5 percent when it's successfully tested by our chemist or something. So if, and I don't know what the answer is to this, but hypothetically it reaches that level of purity before it goes all the way to 1.2, then why doesn't it infringe? And here's what Judge Andrews said. It's at the bottom of A14. Even assuming Lupin's reduction reaction reaches practical completion by the .05 percent ketone level, Otsuka fails to show that no more than one molar equivalent of sodium borohydride had been added by that point. It's a failure of proof case in that they can't show you any evidence that it reaches completion before the full 1.2 as opposed to the 1. What about the testimony that it definitely would have reached completion well before the 1 was added? So that testimony is all based on Experiments 109 and 115. And when you look at those on page 15 of the opinion, Judge Andrews says those were run with a different ketone precursor level, a different sodium borohydride level, a different pH, a different temperature. I get that. To the extent it was based only on that, I think you're right. What about the fact that it's just based upon the expert's knowledge of basic chemistry principles? Why isn't that sufficient? There is no statement. His statements that O will be done by .5 were based on Experiments 109 and 115. He said, oh, the DMF process will be four times faster than this experiment, eight and a half times faster than this one. But those experiments, Judge Andrews found, and the record fully supports, were subject to a margin of error. They had anomalies in them. What's the best J8 page we could look at to see that everything has to fundamentally rely on Experiments 109 and 115? Because that seems to be what you're telling us in response to Judge Hughes's question. Give me one moment, Your Honor. So if you look at Joint Appendix 1981-94, this is the post-trial briefing from Otsuka. And it starts at, let me get you a pin site, 1991. If you look at what they argued, the infringement argument starts, the data demonstrate that Newcomb's process comprises reducing the ketone precursor in the presence of a claimed amount of sodium borohydride. That's the heading on 1991. And they start off right there with Experiments 109 and 115. There is no independent argument that on Rausch's say-so, we infringe. That is only an argument you find on appeal. They never made that argument below. And you'll see what Rausch did is he said in Experiments 109 and 115, it's complete when you add .91 molar equivalents, even though it's different conditions, different pH, different scale. And then Rausch goes on to testify that based on that, then the DMF process will also infringe. They never made any independent argument that, oh, we know it's .5 based on just known reaction rates and known chemistry. It's all tied to 109 and 115. And if I could, just for the record. So let me ask you this. Let's assume that whatever I conclude about claim construction and stuff, I find Dr. Dichtel's testimony insufficient, that I read it as either the absolute completion theory, which the district court already had rejected to the extent it was putting that in, it's unreliable on infringement, so you couldn't argue it, or that he's somehow arguing that the process is complete when you do the quenching step and check the thing. And that also I find insufficient because it could reach the purity level far before that. So if I throw out all of that stuff, all of that testimony, what remains to support the district court's infringement, lack of infringement, or whichever it is, lack of infringement? The district court's, we disagree with the premise that you just threw out. I understand. I'm asking to hide the data. In that, it's still a failure of proof. It's because Judge Andrews said experiments 109 and 115 aren't reliable. That finding is not clearly erroneous. And Planoff's other testimony is based on those two experiments, which the judge said is unreliable. And it's their burden because it's their test. And it's their burden, and they did no testing. So we're in this world where they're saying Dr. Dictel is insufficient. But the judge didn't just rely on Dr. Dictel. He said, even if I give you your .05 percent cutoff, even if we look at it from your point of construction, which is unchallenged, you haven't met your burden. And the record clearly supports that.  Can you point to me where he clearly made that as an alternative holding? Because I really see his findings on this as relying a lot on what Dr. Dictel said. And if I conclude that Dr. Dictel's testimony is unreliable under a bunch of reasons, if his factual findings are infected by that, don't I at least have to send it back and say you can't consider this testimony for this purpose? Well, so twofold. Page A14, at the bottom of the page, is his finding that even assuming Lupin's reduction reaction reaches practical completion at the .05 percent ketone precursor level, Atsuka fails to show that no more than one molar equivalent of sodium borohydride has been added by that point. That's an express finding by the judge. And then on the next page. What does he cite to you for that? He doesn't really cite anything. What's that based on? That's based on his review of the entirety of the evidence and. . . Including Dr. Dictel's testimony? No. No. He says Atsuka has failed to show. So there are affirmative proofs to get you that question. And then on the next page, he throws out 109 and 115. On the issue of Dictel, though, the testimony that was pointed to on 526 about absolute completion, Dr. Dictel says that the reaction continues after the .05 percent threshold in Lupin's test. That's undisputed. And 2285 are the test results that actually show it goes to an undetectable level. The absolute completion theory comes from Atsuka's post-trial brief, where they try to cast that on Dictel based on how they crossed him. The other important point to note, though, there is an express finding of waiver by the district court judge with respect to their challenge to Dr. Dictel. They did not object to any of his testimony at trial at all. Right. I understand. To the extent there's some kind of, like, post hoc Daubert challenge, we're not going to look at that. I'm just determining whether I think his testimony is completely unreliable because it proceeds under a claim construction, so therefore it can't be evidence, not that it should have been excluded. No. His testimony is from a scientific standpoint where he tells you here's how the reaction proceeds, but then from a chemistry standpoint, it continues on. But that second piece doesn't matter, because the judge said even if I set the practical completion at .05 percent, as Atsuka argues, there's no evidence in the record that that happens before one molar equivalent.  Let me set out a few different questions for you on this front. So it sounds like part of your argument is that if we throw out Dr. Dictel's in the record to say that you still would get the finding of no infringement based off of what is included with these two experiments and also Dr. Walsh's testimony, is that what you're saying? Yes. It's a failure. They will still have a failure of proof because the .05 cutoff that they're arguing for, their expert says the reaction proceeds past that point. A2285 shows you it progresses past that point, and the judge has an express finding that they have no evidence that shows it happens before one. They rely on the experiments. And in criticizing Experiments 109 and 115, and I think this is important, the judge didn't rely on Dictel's testimony. He relied on Walsh's testimony, their expert. And if you look at A325, 14 through 25, and A359, 10 through 23, and I'll walk you through both of these. And this is Dr. Walsh's testimony. And it's actually 324 and 325. Dr. Walsh is talking about the experiments and says that that represents a margin of error. And he was explaining it's an irreversible reaction, so the ketone precursor level should go down over time. In Experiment 115, the reported results go down and then back up, which is physically impossible. So Dr. Walsh says this must be a margin of error in the measurements. And then at 359, 10 through 23, on cross-examination, Dr. Walsh admitted, and it's at lines 20 and 21, that these experiments hadn't been put through an appropriate level of quality control. They were one-off experiments. And so based on Walsh's own testimony, the judge says these two experiments are unreliable. That's fact-finding. Can I ask you to look at 344 and 345? 344? Yes. Are these testimonies about those experiments, too, or are these more general statements that, from Dr. Walsh, that he believes that the reaction would have been complete before lupin adds 0.5 molar equivalents? So he gives – Starting usually where I am, like basically the middle of the page.  Line 16. Yeah. He's saying that this is going to happen in this timeframe, and then he's asked, do the experiments support this? And even if I agree with you on the experiments, is this testimony from about line 16 to about line 6 on 345 based only on those experiments, or is it based upon his kind of independent knowledge of how chemistry works and this process would work? That testimony, in context, he drew a graph. And the graph is at – We've got a slide, yeah. Yeah. It's somewhere in the 4,000s. Can you answer my question, that question first? Is this testimony infected by the experiments, or is this kind of independent testimony? And I'm doing both. The graph is at 4,220, and that graph is based on the experiments. Like, his entire testimony about these amounts, he has no – he proffered no reaction rates separate and apart from experiments 109 and 115. Like, whatever his expertise is, he can't just say, well, it's my opinion that it's done by 0.5 with no reaction rates, no accounting for temperature, scale, any of that. How do we know that appendix page 4,220 is based on the experiments? How do we know that? Can you pull it up? Give me one second to get back there. I believe that slide. My belief, Your Honor, is that this is slide 34, PTX. Yes, but I'm basically asking a variant of the question Judge Hughes asked you, too. Yeah. How do I know that this slide is based on the experiments as opposed to being somehow independent? Give me one second. He testifies at page 344. Looking at this slide, it's line 16, slide 34. And as I stand here, I don't have the marking that says it's slide 34. Well, even if it is slide 34, I don't see that it's necessarily connected to the experiments. That's what I'm trying to understand, too.  I think that he and I are maybe in the same page. Look, if it's connected to the experiments, I understand your argument. What I'm trying to get at is – and let's just start with the proposition that is testimony on 344 and 45 that we're looking at. And this slide isn't connected to the experiments, but is somehow based on his independent knowledge as an expert witness, which he's qualified to testify on. Why isn't that evidence that is sufficient to consider? I think the district court just said this is conclusory. I don't see it as conclusory at all. Well, he did no analysis of the reaction rate, the temperature, the scale, the amount of sodium borohydride. All of that was done in connection with experiments 109 and 115, where he says four-fold faster, eight-fold faster. He has no experiments to say this is how fast the actual DMS process could go. And to be an expert and go, well, based on my experience, it's done by .5, and that happens to be the claim number, it isn't the kind of science that you need to carry your burden. And the district court didn't credit that to – even if it's separate and apart, Judge Andrews didn't credit it. And he sat through the entire trial. He listened to all of the evidence. And this is not a case where they're saying one particular fact-finding is clearly erroneous. When you look at the brief, Atsuka's position is that almost every finding he made on unexpected results on obviousness is clearly erroneous. Almost every finding he made on the infringement issue is clearly erroneous. This is a seasoned trial judge who heard all of the evidence and made credibility determinations and factual findings that don't leave you with a firm conviction that he made a mistake. So part of your answer to Judge Hughes's question is that these two pages we were looking at, 344 to 45, weren't relied on by Judge Andrews in reaching his final conclusion? Is that part of your answer? Give me one second. I need to check if he – I need to check if he cited 109. Okay, 109. So the appendix numbers at 345 have a trial transcript page number at the top, and Judge Andrews' opinion uses the trial transcript? I understand. You've got to translate it to the JA pages. I understand what you're saying. Let me ask you one final question, because I know we're over time and I want to wrap up. I have at least some concerns about Dr. Dicktel in terms of the response to the Kiyosera opinion and whether or not he would have qualified as a poser.  So that argument that they make with respect to Kiyosera and Dr. Dicktel, if you look at – I want to make sure I get the page number right – A, 1990 to 91, and B, 2057 to 58. It's Hatsuka's post-trial brief. These are the exact arguments that Judge Andrews said were waived. And for the first time in my history of doing this, I actually printed out a Federal rule, went back and looked to see – Judge Andrews cited Rule 103A. And the rule says, if a ruling admits evidence apart from a claim, the party on the record must timely object or move to strike and state the specific grounds of the objection where they can't claim error on appeal. And the question I would have for counsel, where in the record is that specific objection? There is not one objection during Dr. Dicktel's testimony. And the Court's finding of labor, which is reviewed for abuse of discretion, clearly meets the rule. And the only thing they can point to is a vague statement, an opening statement, that Dr. Dicktel doesn't qualify as a post-trial. But they waived any right to object by not bringing it up when his testimony was submitted. Roberts. Okay. We've gone even more over the extra time. Thank you, Your Honor. I appreciate the time. I'm going to keep it at 5 minutes, but if we need it, he went over, too, so we'll take it. I appreciate that. Can you just hone in on this, what we were discussing with him about the Roush testimony on 344 and 45 in the slide, and whether that is connected to – let's just assume for this that I think that the district court was right in saying all those two experiments aren't relevant, they were different, so to the extent Roush relied on those, that evidence is out. Is it – my one question is, is that evidence on 344 and 345 and the slide connected to that, or is it apart from that? Dr. Roush gave testimony on 109 and 115, and also testimony separate and apart from that. If we could look, Your Honor, at 4223. This is Dr. Roush's demonstrative where he's setting forth his opinions. Point one is that Lupin's reaction proceeds quickly, such that the reduction is complete before one molar equivalent is added, and point two is that Lupin's data shows that the reaction is complete by at least – by the time .91 molar equivalents is added. He was making – What data is he relying on? That data, Your Honor, is experiments 109 and 115. But that's the data that he said wasn't the same. Well, precisely – well, Your Honor, my point is, number one, number one, Dr. Roush separates his opinions. I'm a little curious as to why you're pointing me that page when I ask you about the other pages, which seem not necessarily connected to those experiments. Is it because that's all part of the same testimony, it's all connected? No, Your Honor. I was just going to get there. In 4223, Dr. Roush explicitly separates his opinions. First he says Lupin's reaction proceeds quickly, and that's why they infringe. And then he says separately there's data that also confirms that. They are separate. And then if Your Honor is pointing at 4220, the graph there – the graph there is the data that he's relying on. And then he says, well, the data that he's relying on is the experiments. If I find those experiments, like Judge Andrews found, are not relevant because they're different, then how does that point 2 not infect this whole slide? Well, so you – well, these are separate points. You strike point 2, you're still left with point 1. And that's consistent with Dr. Roush's testimony. How do you know that point 1 doesn't rely on experiments 109 and 115? And it's super-conclusory, too. Well, it's non-conclusory, Your Honors, because Dr. Roush explained that he was assessing the DMF reaction conditions with the non-sodium borohydride reaction rates to confirm when the reaction would reach completion. Let me make a better statement. It sounds like appendix page 4223 is a summary slide. So what might have been helpful for our purposes is to see the slides immediately proceeding, because it looks like there's a gap here, which is probably why Judge Schuetz and I are asking you so many questions about whether or not some of these things depend on Experiments 109 and 115. The point I was trying to make, Your Honors, is that Dr. Roush's testimony, he offered two separate opinions. He was not offering testimony just on Experiments 109 and 115. Is there something you can point us to to show it's a separate opinion besides this slide, appendix page 4223? Not in his slides, Your Honors, but there is. I'll take anything right now. I don't care if it's a slide or if it's almost something from the moon right now, but can you point me to something different besides slide 4223 to show that you have two separate opinions, because right now it all seems to be infected with Experiments 109 and 115. So his testimony explaining that slide, Your Honors, in 310 and 311, APPX 310, 311, he essentially goes over the slide, mentioning his bullet points. APPX 314 through 317 is where Dr. Roush provides additional testimony on how quickly these reactions proceed. Dr. Roush points to the fact that Lupin's DMF permits the sodium borohydride to be added in as little as 30 minutes, plus a 15-minute stir time, demonstrating that reflecting that the reaction proceeds very quickly. Anything else? Yes, Your Honor. APPX 344 and 345, that's where Dr. Roush explains that once you've added .25 equivalents, the reaction will proceed extremely quickly and be complete within 30 minutes. And how are we to understand all this testimony is independent and not interwoven with his reliance on Experiments 109 and 115? That's what the record shows, Your Honor. At the very least, the decision needs to be vacated and remanded for further proceedings on this point. I also want to make one other point on 109 and 115. Dr. Dicktel did testify about those experiments. He provided testimony that those experiments don't show completion based on his understanding of completion, and the district court cited that testimony at APPX 15, and cited that testimony several times. Opposing counsel point us to parts of your post-trial brief that really seem to show that all of the infringement evidence was interwoven with Experiments 109 and 115. Was there a different part of your post-trial brief that you want to point us to that did not depend on Experiments 109 and 115? And if the answer is you don't have it, you can say I don't have it. So, Your Honor, we were only given 10 pages in the post-trial brief, so we had to be very succinct. We made the argument at trial. In the post-trial brief, APPX 19, I believe it's 1985, Mr. Zimmerman, at the last sentence, he pointed to a sentence that begins, Under this construction, Lupin infringes the asserted patents. And it goes on to say, Lupin synthesizes tovaprin by uniformly adding 1.2 molar equivalents of sodium borohydride over 30 to 240 minutes into the reactor containing TOV3. And the data demonstrates the reaction reaches completion. So Mr. Zimmerman only focused on that second part of the sentence, not the first part, which is based on the DMF reaction conditions. And that's what Rausch's testimony on why it reaches completion so quickly was based on. It was based on those reaction conditions. Thank you. You're way over time. Understood. Thank you, Your Honor. Case is submitted.